**UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

United States of America,

        Plaintiff,                        Case No.  1:20cr106

             v.                     Judge Michael R. Barrett

Darrell Johnson,

        Defendant.

### OPINION & ORDER

    This matter is before the Court on Defendant's Motion to Suppress. (Doc. 16). The United States filed a Response. (Doc. 19). The Court conducted an evidentiary hearing on November 2, 2020, (Doc. 21), and the parties submitted post-hearing briefs (Docs. 24, 25, 26).

### I.   BACKGROUND

    The following facts were revealed at the evidentiary hearing and presented by means of the testimony of two of the arresting officers—Officer Michael Lowe ("Officer Lowe") and Officer Caleb Sarchet ("Officer Sarchet")—(Doc. 23); Officer Lowe's body cam video (PX#2); Officer Sarchet's body cam video (PX#3); a January 8, 2020 Incident Detail Report (PX#1, DX#2); and Defendant's January 8, 2020 booking information sheet (DX#1).

    On the afternoon of January 8, 2020, the Cincinnati Police Department received a 911 call from a security guard at the Cincinnati School for Creative and Performing Arts ("CSCPA") in downtown Cincinnati. The CSCPA security guard reported that, minutes earlier, he and a group of students saw a black male waiving a gun at CSCPA students.

Cincinnati police officers responded to the subsequent 911 dispatch regarding the armed suspect seen at CSCPA.

At 16:13:16, the Incident Detail Report given to the responding officers from the 911 dispatch informed the officers that "SUBJ FLASHED A GUN AT STUDENTS IN THE PARKING LOT, POSSIBLY A TAFT STUDENT – SUBJ MB, DREADS, BLK HOODIE, TAN PANTS." (PX#1, DX#2); (Doc. 23, Officer Lowe testimony, PageID 102-03) ("Subject flashed a gun at students in the parking lot, possibly a Taft student, subject male black, dreads, black hoodie, tan pants."). At 16:13:27, the 911 dispatch informed the responding police officers that the suspect was "L/S ON FOOT TWDS WASHINGTON PARK. (PX#1, DX#2); (Doc. 23, Lowe, PageID 103) ("Last seen on foot towards Washington Park.").

Officer Lowe, one of the responding officers, went towards Washington Park, which is across the street from the rear of CSCPA. (Doc. 23, Lowe, PageID 103-04). Officer Lowe saw Defendant enter Washington Park's restroom's lobby. Officer Lowe observed that Defendant was a black man who had a black hoodie on and "didn't exactly have tan pants on," and could not tell if Defendant had dreads because Defendant had his hood up. (*Id.* PageID 105). Officer Lowe called for back-up. (*Id.* PageID 107). Officer Lowe exited his police scout car at 16:21:15 when back up arrived. (PX#2).

At 16:21:31, the 911 dispatch provided the responding officers with the additional description: "ON CB SUSP IS MB, 14-15 DRDS BLK HOODY TAN PANTS." (PX#1, DX#2). Defendant is 27 years old with visible facial hair and facial tattoos. (DX#1). The Court observes that Defendant appears to be older than his given age of 27. Officer Lowe's body camera footage shows that Defendant exited the men's restroom into the restroom's enclosed small lobby area. (PX#2). As Defendant exited the men's restroom

into the lobby area, Officer Lowe approached the lobby area and was accompanied by multiple Cincinnati police officers. There were also several police scout cars parked immediately outside of the restroom's lobby area when Defendant exited the men's restroom. Officer Lowe's body camera footage shows that Defendant is a black male, had prominent facial hair and facial tattoos, who was wearing a black coat and hoodie and light grey sweatpants, and who did not have apparent dreads, as his hoodie was partially up, and he had a beanie cap underneath. *Id.*

Officer Sarchet arrived shortly after Officer Lowe and, at 16:21:56, began supporting Officer Lowe in questioning Defendant. (Doc. 23, Officer Sarchet testimony, PageID 143); (PX#2); (PX#3). At this point, there are six officers and Defendant in the small enclosed lobby area and Officers Lowe, Sarchet, and another officer are directly in front of Defendant with Defendant's back to a wall. (Doc. 23, Officer Sarchet, PageID 151, 154-55); (PX#2); (PX#3). Also at this point, the officers know that Defendant is a black male wearing a black hoodie; however, Defendant had on light grey sweatpants, not tan sweatpants; is clearly older than 14-15; has facial hair and facial tattoos; and no dreads are visible. Defendant's arrest record indicates he is 27 years old, 5'6, 185 pounds, and has short hair. (DX#1). Both officers testified that they could have asked Defendant if he had dreads when they initially approached him but chose not to. (Doc. 23, PageID 115, 149-150).

At 16:22:02, Officer Sarchet asks Defendant if he minds if Officer Sarchet pats him down. (PX#2); (PX#3). Defendant responds that he does not want a pat down. (PX#2); (PX#3). After the officers explained that they are questioning Defendant because a man wearing a black coat flashed a gun at CSCPA students, at 16:22:39, Defendant indicated

3

that he was not at CSCPA and had recently arrived at Washington Park by bus. (PX#2); (PX#3). Defendant engages in no furtive movements as the officers continue ask him questions and he keeps his hands out of his pockets, as directed by the officers. (PX#2); (PX#3).

At 16:23:45, Officer Sarchet directed Defendant to lift up his shirt so that the officers can see Defendant's waistband. (PX#2). Officer Sarchet testified that Defendant raised the left side of his shirt, but not the right side of his shirt. (Doc. 23, Officer Sarchet, PageID 145, 157); (PX#2); (PX#3). Officer Sarchet grabbed Defendant's right hand, pulled the right side of Defendant's coat up, observed a firearm, braced Defendant against the wall, and informed the other officers. (PX#2); (PX#3). At 16:24:36, the officers placed Defendant "IN CUSTODY." (PX#1).

At 16:31:46, the 911 dispatch provided the responding officers with an additional description of the, now, suspects, per an interview with CSCPA students: "PER STUDENTS MB 14-15 5'7-5'9 DREDS VERY THIN, RED HOODY #2, MB, 5'7-5'9 BLK OR YELLOW HOODY." (PX#1, DX#2). Defendant was not involved in the incident at CSCPA.

A one-count indictment charges Defendant with possession by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and (2). (Doc. 3). Defendant moves to suppress any and all evidence regarding the firearm seized from him, and any statements that he made concerning ownership of that firearm, on January 8, 2020. (Doc. 16). He brings his arguments pursuant to the Fourth Amendment. *Id.*

## II. __ANALYSIS__

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968). Here, Defendant "[u]nquestionably [] was entitled to the protection of the Fourth Amendment as he walked down the street" and "[t]he question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure." *See id.* at 9.

"[W]hen [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 20 n.16. Such a restraint amounts to a seizure only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *see United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009). The facts must be judged against an objective standard. *Terry*, 392 U.S. at 21. Here, when Defendant exited the men's restroom at Washington Park, he was immediately confronted by multiple officers and questioned by Officers Lowe and Sarchet in the restroom's small enclosed lobby area with Defendant's back against a wall, and there were several police scout cars parked immediately outside. (PX#2); (PX#3). Based on the facts of this case, the Court finds that no reasonable person would have considered

themselves free to leave. The officers' stop of Defendant was a nonconsensual *Terry* stop and seizure.

The Fourth Amendment prohibits a police officer from even briefly detaining an individual unless the officer has a reasonable suspicion that the individual has been involved in criminal activity. *United States v. Bearden*, 213 F. App'x 410, 414 (6th Cir. 2007) (citing *Terry*, 392 U.S. at 20-22). A stop for questioning of a person by an officer is reasonable so long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003). "In finding reasonable suspicion, 'the totality of the circumstances the whole picture must be taken into account.'" *Vite-Espinoza*, 342 F.3d at 466 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

"Moreover, when the officer is 'justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a search 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others.'" *Vite-Espinoza*, 342 F.3d at 466 (quoting *Terry*, 392 U.S. at 26-27); *accord Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (explaining that, under the *Terry* doctrine, "a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted."). "The concern for officer safety is not a Fourth Amendment carte-blanche, but the safety of officers is of very high importance." *Bearden*, 213 F. App'x at 416 (quoting *Michigan v. Summers*, 452 U.S. 692, 704 (1981)) (internal citation omitted).

6

The questions for the Court are whether the *Terry* stop was justified by reasonable suspicion and whether the officers had reasonable grounds to believe that Defendant was armed and dangerous. *See Terry*, 392 U.S. at 19, 26-27. At the time that the officers stopped Defendant, he partially fit the 911 dispatch broadcast description. Specifically, the officers knew that the suspect involved in the CSCPA incident was a 14- to 15-year old black male, possibly a Taft student, with dreads who was wearing a black hoodie and tan pants and was last seen on foot towards Washington Park. (PX#1, DX#2); (Doc. 23, Lowe testimony, PageID102-03); *compare* (PX#1, DX#2) (Incident Detail Report's notation for 16:21:31),[1] *with* (PX#2 at 0:00:51). At the time that the officers stopped Defendant, the officers could see that Defendant is a black man wearing a black hoodie; however, Defendant had on light grey sweatpants, not tan sweatpants; is clearly older than 14-15; has facial hair and facial tattoos; and no dreads are visible. (PX#2); (PX#3). Although the officers could have asked Defendant if he had dreads, or to remove his hood, they did not ask either question. (Doc. 23, PageID 115, 149-150). Moreover, as the officers question Defendant, he appears to be nervous, but makes no sudden or furtive movements and keeps his hands visible to the officers at all times.

The Court finds that the articulable justification presented for initially stopping Defendant was that he was a black male wearing a black hoodie in the vicinity of Washington Park. Based on the totality of the circumstances, and considering the information that the officers knew via the 911 dispatch broadcast and their view of Defendant when they initially approached him, the Court finds that the officers did not have reasonable suspicion to stop Defendant. *See Terry*, 392 U.S. at 21; *Vite-Espinoza*,

---

[1] The Court assumes that the responding officers had this dispatch information when they began questioning Defendant. *See* (Doc. 23, Lowe testimony, PageID 98-100).

342 F.3d at 466; *cf. United States v. Myron Willis*, 1:01CR048 (Doc. 27) (Order Granting Motion to Suppress) (Spiegel, J.) (finding no reasonable suspicion where the defendant was a black male in shorts in the vicinity of a crime scene, but did not match other features of description). The January 8, 2020 stop was unlawful, and any evidence and statements obtained during that stop, and the subsequent frisk, must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

As a final mater, and in response to the officers' discussion encompassing their confident conclusions that they had enough, *i.e.*, reasonable suspicion and reasonable grounds under *Terry*, to stop and pat Defendant (PX#2),[2] the Court emphasizes that

> It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search,' Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.'[] It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

*Terry*, 392 U.S. at 16-17.

---

[2] At 16:29:12, after Officer Sarchet placed Defendant in his police scout car, Officer Lowe commented to other officers that "[Defendant] might be in the wrong place at the wrong time with a pistol" and one responding officer replied "could be." *Id.*

At 16:30:04, as the officers continue to gather evidence and talk about their encounter with Defendant, Officer Sarchet said "I thought it was weird when I asked [Defendant], when I said sir, can I pat you down and he said 'no'," and another responding officer stated that she "th[ought] we had enough to pat him down anyway." *Id.* Officer Sarchet responded "oh, we did" and Officer Lowe responded "yeah, we did." *Id.*

At 16:31:04 Officer Sarchet stated "'cause [Defendant] didn't, that's why I explained to him, I said somebody pointed a gun at some kids, I said so like, was that you? and [Defendant] was like 'fuck no,'" and Officer Sarchet added, "I think it wasn't." *Id.*

At 16:31:13 Officer Lowe repeated "wrong place, wrong time." *Id.* At 16:31:14 Officer Sarchet responded "I think it was." *Id.*

### III.    <u>**CONCLUSION**</u>

Based on the foregoing, it is hereby **ORDERED** that Defendant's Motion to Suppress (Doc. 16) is **GRANTED**.

**IT IS SO ORDERED.**

/s Michael R. Barrett
Michael R. Barrett, Judge
United States District Court
